## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| **LYNETTE CASTILLO, HER HUSBAND FELIX M. AVILES FRANCO, THEIR CONJUGAL PARTNERSHIP AND PERSONNEL RECRUITING SERVICE, CORP.** | **CIVIL ACTION NO. 24-CV-1427** |
| **PLAINTIFFS,** | **JURY TRIAL DEMANDED** |
| **VS.** | |
| **KLAYMAN & TOSKES, P.A., LAWRENCE L. KLAYMAN, STEVEN TOSKES, INSURANCE COMPANY A AND INSURANCE COMPANY B** | **FRAUD;**<br>**Article 1536; 1520 and 1522 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. §10801**<br>**FRAUD 18 U.S.C. § 1349**<br>**BREACH OF FIDUCIARY DUTIES;** |
| **DEFENDANTS.** | **UNJUST ENRICHMENT AND DAMAGES** |

## VERIFIED CLASS ACTION COMPLAINT AGAINST KLAYMAN TOSKES PA, LAWRENCE L. KLAYMAN, AND STEVEN TOSKES

The Plaintiffs, by and through the undersigned attorneys, individually and on behalf of similarly situated persons, complain against the Defendants upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through its attorneys, which included, among other things, a review and analysis of all pertinent courtesy admissions at the Supreme Court of Puerto Rico, news reports, press releases, and other publicly available sources, as follows:

### I.     INTRODUCTION

This lawsuit arises from a scheme by Defendants to mislead hundreds of victims of UBS Financial Services Inc. of Puerto Rico (UBS PR), Santander Securities, LLC, (Santander), Oriental

Financial Services LLC, (Oriental), Popular Securities LLC (Popular), Merril Lynch PR (Merril) and other broker dealers in Puerto Rico (henceforth collectively: "Broker Dealers"), who had lost millions of dollars through those broker dealers in Puerto Rico Bonds and UBS PR, Popular and Santander affiliated non-exchange-traded closed-end funds ("PRCEFs") from 2012 to 2020.

The scheme involved false representations by defendants when contracting with plaintiffs to represent them in claims to recover their losses for a contingent fee without telling them they had not obtained an admission to practice law in Puerto Rico as required by the Rules set forth by the Supreme Court of Puerto Rico[1], committing thus a crime under PR Laws Title 1, §782 (2020)[2].

Defendants, provided them thus with material legal advice through mail, phone and in person that they were not authorized to do, and collected legal fees and withdrew clients' funds from their Interest Only in Lawyers' Trust Accounts ("IOLTA"), without clients' informed consent, incurring thus in mail and wire fraud, and defrauded the Puerto Rico Supreme Court of their $800 fee for *Pro Hac Vice* admission and were, therefore, practicing the law illegally in Puerto Rico.

## I.    NATURE OF ACTION

1.    This is an action brought by Plaintiffs, clients of legal services in Puerto Rico, on their behalf and that of all similarly situated victims against Defendants Klayman Toskes PA, and the Individual Defendants' breaches of their fiduciary duties of loyalty, candor, and good faith and abuse of their control of Plaintiffs claims for damages related to the PR Bonds debacle.

---

[1] *Pro Hac Vice* Admission Rule 12(f) Reglamento del Tribunal Supremo de Puerto Rico. 4 L.P.R.A. Ap. XXI-B. *Colegio de Abogados v. Bello Hernández*, 24 JTS 1, *In Re García Ortiz*, 93 JTS 125.

[2] Practice of Law and Notaries Chapter 63 - Puerto Rico Bar Association § 782. Penalty for illegally practicing the profession Universal Citation: PR Laws Title 1, § 782 (2020) Any person who, without being duly admitted and licensed to practice the profession as provided in this chapter, or who, during the suspension of his license, practices as a person qualified to do so, advertises himself as such or attempts to pass himself off as a lawyer, or as a practicing notary, will be guilty of a less serious crime and if convicted, a fine of up to five thousand ($5,000.00) dollars will be imposed or a prison sentence not exceeding six (6) months, or both penalties.

2.     This lawsuit arises from a scheme by Defendants to mislead hundreds of victims of the Broker Dealers, who lost them millions of dollars through high concentration of investments in PR Bonds and PRCEFs from 2012 to 2020, by contracting with them to recover their losses for a contingent fee without telling them that they had not obtained an admission to practice law in Puerto Rico, committing thus a crime, providing them thus with material legal advice through mail, phone and in person that they were not authorized to do, and collecting legal fees and withdrawing clients' funds from their IOLTA, without clients' informed consent, incurring thus in mail and wire fraud, and by defrauding the Puerto Rico Supreme Court of their $800 fee for *Pro Hac Vice* Admission to an estimated $400,000 and were, therefore, practicing the law illegally in Puerto Rico.

3.     Despite this knowledge, Defendants Lawrence Klayman ("Klayman") and Steven Toskes ("Toskes") and their Law Firm conjured up an enterprise and campaign to engage victims of the PR Bonds and PR CEF losses by holding numerous activities and seminars giving legal advice on how to proceed with a claim to recover their losses and signing legal representation contracts with Plaintiffs and all similarly situated for contingent fees. Defendants then proceeded to file claims in the Financial Industry Regulatory Authority (FINRA) dispute resolution arbitration forum, draft, and file motions, celebrate mediations in the names of their clients and enter into settlement stipulations and agreements, all the while having never applied for the appropriate courtesy admission in Puerto Rico in each case and misleading their clients with legal advice and legal practice that were unlawful.

4.     This illegal advice was the direct and proximate cause for the Plaintiffs' inadequate settlement considerations causing them a shortfall in compensation and remuneration of Plaintiffs losses and to have been charged illegally for contingency honorarium that Plaintiffs have a right

to recover. This conduct seems to be one that poses a threat of being a continued criminal activity that inevitably will be repeated.

5.       This action also seeks to recover damages and penalties arising from defendants' fraud upon the Plaintiffs and the Class for illegally charging and collecting contingent fees and defendants' fraud upon the Supreme Court of Puerto Rico for failing to pay the appropriate Rule 12(f) Courtesy Admission Fee of $800.00 per attorney per case in Puerto Rico.

## II.    <u>NATURE OF THE ACTION</u>

6.       This action arises under Article 1536 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 10801,[3] for compensatory damages suffered by the Plaintiffs as a result of Defendants' willful and malicious tortious conduct, and since the payments made to Defendants for attorneys' fees, they were improperly received under the doctrine of "undue payment". Art. 1520 of the Civil Code of PR of 2020, based on "unjust enrichment" they have an obligation to return all fees and cost that they received without any right to do so,[4] Article 1522 "in bad faith" and finally under Article 2.03 of the Puerto Rico General Corporations Act, 14 P.R. Laws Ann. §3523.

## III.    <u>JURISDICTION AND VENUE</u>

7.       This Court has jurisdiction pursuant to 28 U.S.C Section 1332 (a)(1) and (c) because this is an action for damages between citizens, unincorporated entities, member and

---

[3] This Article was formerly known as Article 1802.
[4] Such article explains that "who, without legal cause, has made the payment of a thing or amount that he did not owe, has the right to demand its restitution from the person who received it. The refund of the payment is not subject to being made by error." This doctrine is well discussed in *Puerto Rico Horse Owners Association v. Confederación Hípica de Puerto Rico*, 2019 TSPR 94 ("For restitution purposes, there is no longer a distinction in Puerto Rican law between errors of fact and errors of law." This case explains to us that "the doctrine of the collection of the undue, derived of the unjust enrichment, is applicable when:
(1) a payment was made with the intention of extinguishing an obligation;
(2) the payment made did not have a just cause, that is, that there was no legal obligation between the one who pays and the one who collects, or if the obligation exists, that it was for an amount less than that paid; and
(3) the payment was made in error and not out of mere generosity or for any other reason."

corporations of different states and the amount of controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees. Pursuant to 28 U.S.C. Section 1391(a)(2), venue of this action is proper in this district because the events, acts or omissions giving rise to the claims occurred in this district. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because  a substantial portion of the transactions and  wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district, and Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect within this  judicial district.

## IV.    <u>PARTIES</u>

9.      The Plaintiffs are Lynette Castillo, her husband Felix M. Aviles Franco, their Conjugal Partnership and Personnel Recruiting Service, Corp., and all residents of Puerto Rico. The corporate entity was created on December 16, 1986, with corporate number 65175, and has been in good standing at the PR Department of State ever since with address at Munoz Rivera Num 23, Ponce, PR, 00717 and mailing address at PO BOX 7863, Ponce, PR, 00732-7863.

10.     As set forth in the accompanying certification and incorporated by reference herein, during the Class Period of September 1st, 2013, to the present, Plaintiffs had been damaged as a result of the illicit legal representation by Defendants thereof by not obtaining adequate compensation for their losses in PR securities and by paying contingent fees to those who were not entitled to collect them.

11.     As set forth in the accompanying certification and incorporated by reference herein, during the Class Period of September 1st, 2013 to the present, Plaintiffs were misled by unlawful

legal advice and were subjected to illegal tactics to acquiesce into an inadequate compensation by those who defendants had a duty to prosecute, through which litigation, and/or mediation would be geared to make whole the victims of unsuitable and/or negligent investment advice related to PRCEFs and PR Bonds starting in September 1st, 2013 until the day of this Class Action lawsuit filing, and have been damaged as a result thereof for lesser compensation, suffering and by paying honorarium that was not earned.

12.     The Defendants are: Lawrence L. Klayman, (henceforth: "Klayman") with address at: 2424 N. Federal Hwy, #450, Boca Raton, FL 33431, with telephone number: (561)997-9956, and email: lklayman@klaymantoskes.com; Stephen Toskes, (henceforth: "Toskes") with address at: 2424 N. Federal Hwy, #450, Boca Raton, FL 33431, with telephone number: (561)997-9956, and email: stoskes@klaymantoskes.com; and Klayman Toskes PA (henceforth: "Klayman Toskes") with address at: 2424 N. Federal Hwy, #450, Boca Raton, FL 33431, with telephone number: (561)997-9956, and website address: www.klaymantoskes.com, all residents of Florida.

13.     Klayman Toskes is a leading national securities law firm practicing exclusively in the field of securities arbitration and litigation on behalf of retail and institutional investors throughout the world. The firm touts itself as representing "investors who have suffered investment losses at the hands of their trusted financial advisors and financial institutions." With offices in California, 4675 MacArthur Court, Suite 550, Newport Beach, CA 92660, Phone: (949) 721–9956; New York, 48 Wall Street, Suite 1100, New York, NY 10005,  Phone: (212)269-9956; Puerto Rico, American Airlines Building, 1509 Lopez Landron, PH, San Juan, PR 00911, Phone: (787)905-7630; and Florida, their main address:  2424 N. Federal Hwy, #450, Boca Raton, FL 33431, with telephone number: (561)997-9956, and website addresses: www.klaymantoskes.com and www.nasd-law.com.

6

14.     In their website Klayman Toskes describe themselves like this: "For decades, Klayman Toskes has been dedicated to protecting investors' rights. From the Tech Bubble in 2000, to the Mortgage Crisis in 2008, and through the Puerto Rico Government Debt Crisis in 2013, Klayman Toskes has represented thousands of investors and has recovered more than $250 million in Financial Industry Regulatory Authority (FINRA) arbitrations and over $350 million in other securities litigation matters for our clients. The firm has represented individual, high net-worth, ultra-high-net-worth, and institutional investors, such as non-profit organizations, unions, public and multi-employer pension funds. Klayman Toskes' success against Wall Street has garnered national attention over the years, with founding partners Lawrence L. Klayman and Steven D. Toskes providing their legal analyses and opinions to the Wall Street Journal, Dow Jones Newswires, New York Times, Reuters, Barron's, ABC News, Chicago Tribune, The National Law Journal, Forbes Magazine, Money Magazine, Investment News, among other financial publications and media outlets."

15.     The first thing that pops up when you access their portal reads: "Restoring Your Financial Lifestyle- If you have lost money in the stock market due to fraud, misrepresentation, negligence, or for other reasons, we can help you. We have successfully recovered over $250 million in FINRA securities arbitrations." The firm is based in Boca Raton, Florida.

16.     Lawrence L. Klayman, a Brooklyn native, is the founding partner of Klayman Toskes, P.A. His practice is exclusively limited to securities arbitration and litigation. Lawrence is a former licensed financial advisor who represents himself as having spent decades applying what he learned from working in the securities industry to practice securities litigation.

17.     Having worked full time while attending law school full time at Nova Southeastern University-Shepherd Broad Law Center and received firsthand experience at the National

Association of Securities Dealers ("NASD") now known as the Financial Industry Regulatory Authority ("FINRA") in the arbitration department. He then worked at Boose, Casey, Ciklin as a law clerk where he worked in the securities group as part of the special counsel team representing Prudential Securities. He then worked at the firm now known as Gordon and Partners running their securities division until 1997 when he began his own firm.

18.    Klayman expresses on his firm's website that the greatest reward in practicing securities arbitration over the years has been the success he has had bringing the brokerage firms to the table to make things right with injured investors. He believes that the combination of experience representing clients on both sides of securities disputes, in addition to his practice as a former financial advisor, lends itself to Wall Street taking negotiations seriously.

19.    Since 1997, Klayman states in his firm's website that he has represented thousands of investors throughout the United States and abroad, that he has managed cases before FINRA, the American Arbitration Association ("AAA"), JAMS, and state and federal courts and that with his team of experienced and capable attorneys and staff, he has recovered hundreds of millions of dollars for those experiencing investment losses due to negligence and fraud.

20.    Klayman is frequently quoted in many national and local press publications regarding securities related news, including: The Wall Street Journal, The New York Times, Barron's, Dow Jones Newswires, On Wall Street, Money Magazine, Barron's, Registered Representative, Seattle Post-Intelligencer, Pittsburgh Post-Gazette, Investment News, BizWatch, The Plain Dealer, The Cincinnati Enquirer, The Palm Beach Post, The Florida Times Union, and others. Additionally, Mr. Klayman is a member of the Florida Bar Trial Lawyer's Section, and a former member of the Palm Beach County Bar Association and Academy of Florida Trial Lawyers. Klayman has a Juris Doctor from Nova Southeastern University's Shepherd Broad Law Center

and a bachelor's degree in economics from New York University. He is admitted to practice law in State of Florida and U.S. District for the Southern District of Florida.

21.    Steven D. Toskes has focused his entire legal career on securities arbitration and litigation. Steven received his bachelor's degree in 1995 in Communications and Broadcast Journalism from Florida Southern College and his Juris Doctorate in 1999 from Nova Southeastern University, Shepard Broad Law Center. While in his senior year in law school, unsure about what area of law he wanted to practice, Toskes took a securities law course and had an interest in the stock market which he discussed with his father as a young child. Upon graduation from law school, Toskes joined the securities law firm of Lawrence Klayman, P.A. as an associate attorney until, in October 2000, when he became a partner with the law firm of Klayman, Lazarus, & Toskes and has remained with the firm ever since.

22.    Toskes claims to assist investors by returning them to their previous level of financial comfort lost through brokerage firm negligence or fraud. In addition to representing investors, Toskes has also handled regulatory inquiries and investigations by FINRA and its predecessors on behalf of securities brokers and brokerage firms regarding financial advisor employment issues.

23.    Toskes has performed in dozens of seminars about investor rights and investment losses and is a lifetime member of the Million Dollar Advocates Forum and the Multimillion Dollar Advocates Forums reflecting the substantial verdicts and settlements he has achieved over the years. Fewer than 1% of U.S. attorneys are members of these organizations. Steven is also listed as one of America's Top 100 High Stakes Litigators. He is also a former member of the American Association for Justice formerly known as the American Trial Lawyers Association, the American Bar Association, and the Broward County Bar Association. Mr. Toskes is admitted to practice law

in Florida and the United States District Court for the Southern District of Florida and has represented numerous customers in arbitrations and mediations before FINRA, AAA, JAMS, and state and federal court. Toskes has a bachelor's degree in communications and Broadcast Journalism from Florida Southern College and a Juris Doctorate from Nova Southeastern University, Shepard Broad Law Center. Toskes is admitted to practice State of Florida United States District Court for the Southern District of Florida.

<h2 style="text-align:center">V.    <u>FACTUAL ALLEGATIONS</u></h2>

**A. The Rules for Pro Hac Vice Admission**

24.    The Supreme Court of Puerto Rico is the forum with the inherent and exclusive power to admit lawyers to practice the profession. *In re Peña Peña*, 153 D.P.R. 642,649 (2001). By virtue of this power, the Supreme Court approved the Regulations of the Examining Board of Aspirants to the Practice of Law, 4 L.P.R.A. App. VII-B, to regulate the exercise of the profession and protect citizens from people unfit to practice it. In it, they prescribe the minimum requirements that an applicant to practice the legal profession on the Island must meet. *Id*.

25.    Courtesy admission, also known for its latin term *pro hac vice*, refers to a permission given to a lawyer, member of a Bar in good standing but not admitted to the practice of the profession in another jurisdiction where that attorney needs or wishes to appear or participate in a specific case in that jurisdiction. In Puerto Rico, at the beginning of the twentieth century, the Legislative Assembly approved a statute to confer on the Supreme Court the power to admit lawyers of good reputation who practiced in some other jurisdiction of the United States to appear before the Island courts in special situations instead of having to pass the TSPR Bar examination. In 1946 the PR Supreme Court ("TSPR"), finally created a rule to regulate admission by courtesy.

The now amended Rule, currently, Rule 12(f) of the Regulations of the Supreme Court in force, adopted in 2011, and amended in June 23, 2015, regulates this type of admission in our jurisdiction.

26.    The rule reads: "Any person admitted to practice law in a U.S. jurisdiction may request to be authorized as a courtesy by this Court to apply as a lawyer in Puerto Rico in special cases before the courts, administrative agencies and procedures on alternative resolution methods of disputes, including arbitration processes. […] Duly submitted applications will be granted by the Secretary or Secretary of Court, unless the number of applications presented by the applicant demonstrate the applicant is actually practicing law regularly in Puerto Rico." Rule 12(f), *Id*.

27.    To comply with Rule 12(f): "The application must be endorsed by a person duly admitted to the practice of law by the PR Supreme Court, who will attest to the capacity of the applicant to advocate as an attorney or lawyer in the corresponding case. The attorney endorsing the application must also: a) appear as a lawyer of record in the corresponding case together with the applicant person; b) sign any pleading, motion or document prepared in relation to the corresponding case; c) be notified of all allegations, motions to be notified applicant. and others to the processes, documents person d) accompany the person who is admitted out of courtesy every time they apply or participate in a deposition or any other related procedure with the corresponding case, unless excused by the forum that serves the case." *Id*.

28.    The Rule also requires that: "A certificate of good standing by the highest court of each of the jurisdictions of the United States of America in which the person applicant is admitted to practice the profession must be attached to the application. The certificate will record the fact of its admission and that the person requesting such, remains duly accredited and active as of the date of the certificate. This certificate must have been issued within ninety days prior to submission of the application. The applicant must not have been disbarred or suspended from any jurisdiction.

Furthermore, the admission of the lawyer endorser must be duly accredited in Puerto Rico, regardless of whether he/she practices the profession mainly in another jurisdiction." *Id*.

29.     Rule 12(f) states also that: "The request for admission by courtesy must include internal revenue stamps worth eight hundred dollars ($800) unless the Court authorizes a waiver for a *pro bono* case or for just cause." The $800 fee for *pro hac vice* admission is to be paid by each attorney involved in drafting, advising, representing, consulting and any other work, appearance, be that appearance in person or remotely and is *numerus apertus*. "The application will be exempt from payment of fees when a lawyer from legal aid clinics from a law school, from Pro-Bono Inc. or the College of Puerto Rico Lawyers, Legal Services Puerto Rico, Inc. or the Legal Aid Society of Puerto Rico endorses the application for admission by courtesy to provide *pro bono* legal services through said entity. If the Court determines to deny the request for admission as a courtesy, the fee will not be refunded." *Id*.

30.     The Rule also states in its pertinent part that: "That a person has been admitted by courtesy in accordance with this rule or is providing legal services in Puerto Rico under any of the circumstances provided for in the paragraphs above, does not mean that it such applicant is authorized to represent another person or make the public believe that the applicant is admitted to the practice of law in Puerto Rico."

31.     In regards to arbitration practice, the Supreme Court expressed in *In Re Wolper*, MC-2012-024 that: "FINRA is an independent agency that regulates the securities industry operating in the United States. The agency also serves as an industry dispute resolution forum. Arbitration, one of the dispute resolution procedures at FINRA, is governed by the regulations approved by the entity itself. The applicable regulations depend on the type of dispute to be submitted to arbitration." The Supreme Court then cites FINRA rules on representation by an

attorney and says: "At any stage of an arbitration proceeding held in a United States hearing location, all parties shall have the right to be represented by an attorney at law in good standing and admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States, **unless state law prohibits such representation**." *In Re Wolper, supra*.

32.    The Supreme Court of Puerto Rico has expressed with regards to the noncompliance with the rule that no one is exempt from it. In *In Re Wolper and Lamb*, *supra*, The PR Supreme Court cites Section 7 of Law 17, *supra*, to say: "[n]o person who is not a lawyer authorized by the Supreme Court of Puerto Rico may dedicate himself to the practice of the legal profession, nor announce himself as such, nor as a judicial agent, nor manage, with the exception of his own affairs, any judicial matter. or quasi-judicial before any court of law; Provided, that the violation of any of the provisions contained in this section, shall be considered and punished as a less serious crime; Provided further, that the fact of any lawyer authorizing with his signature deeds, allegations and documents in which said lawyer is not bona fide the true lawyer or notary of the matter or substitute for said lawyer or notary; and provided, also, that prosecutors will have the duty to investigate violations of this section, and if they find just cause, they may request from the Supreme Court the temporary or permanent disqualification of any lawyer or notary who has violated the previous provisions."

33.    In *In Re Lorenz Michel Pruss*, 2013 TSPR 126, the Associate judge Pabón-Charneco states as to the importance of proper admission to the Court in this jurisdiction that "[t]o conclude otherwise would have meant encouraging a person not admitted to our jurisdiction to carry out activities that this Court has already considered as belonging to the practice of law. Such is the case of legal guidance and advice. In *In re Gervitz Carbonell*, 162 D.P.R. 665, 701 (2004),

we conclude that Canon 33 of the Code of Professional Ethics "prohibits a lawyer not admitted to our jurisdiction from providing legal advice to a lawyer's clients even if the matter involves an out-of-court matter." *Id*.

34.    In *In re Gervitz Carbonell*, 162 D.P.R. 665, 701-702 (2004), the PR Supreme Court established that legal practice outside the instances established in Rule 12 of the Regulations of the Court constitutes illegal practice of the profession. Furthermore, Sec. 7 of Law No. 17 prohibits not only the illegal practice of the profession through appearances before judicial forums, but also prohibits other types of actions, such as identifying and representing being a lawyer to potential clients. *Id*., p. 702. In that case, the PR Supreme Court also made reference to Canon 33 of the Code of Professional Ethics, 4 L.P.R.A. App. IX,7 and noted that it, among other things, prohibits a lawyer not admitted to our jurisdiction from providing legal advice to a lawyer's clients even if the matter is out of court. *Id*., p. 701.

35.    In our jurisdiction the practice of the legal profession by persons not authorized by the PR Supreme Court is prohibited. Furthermore, as mentioned above, this prohibition is not limited to appearances in judicial and quasi-judicial forums, but in order to practice in this jurisdiction, authorization from the PR Supreme Court is required, whether through admission by bar exam, admission of law students or courtesy admission for special cases. For this reason, and by virtue of the Court's inherent power to regulate the practice of the profession in Puerto Rico, they require that any lawyer not admitted in our jurisdiction who wishes to appear on behalf of a party in an arbitration proceeding must request admission as a courtesy, as provided in Rule 12(f) of the Rules of the Supreme Court, *supra*.

14

36.     Associate Judge Pabón-Charneco has stated that "[l]ikewise, recently in *In re Alam M. Wolper; Nathan Lamb; Adam Tullier*, 2013 TSPR 86, 189 D.P.R. ___ (2013), we emphasize that:

> "'In our jurisdiction, the practice of the legal profession by persons not authorized by this Court is prohibited. Furthermore, as mentioned above, this prohibition is not limited to appearances in judicial and quasi-judicial forums.' Therefore, expressing that the practice of law extends beyond judicial forums and only granting admission out of courtesy when a lawyer not admitted to our jurisdiction is going to apply in our forums is antagonistic and contradictory.
>     We cannot encourage a person not admitted to our jurisdiction to perform functions that have been attributed to the legal practice of the profession without requiring authorization from our Court. In addition to contravening the Canons of Professional Ethics, we are promoting a violation of the provisions of Law No. 17 of June 10, 1939, 4 L.P.R.A. sec. 740. This law specifically provides that if the person has not been admitted to our jurisdiction, [he] may not engage in the practice of law, nor advertise himself as such, nor as a bailiff, nor manage, with the exception of his own affairs, any judicial or quasi-judicial matter before any court of law; Provided, that the violation of any of the provisions contained in this section shall be considered and punished as a less serious crime." *In Re Lorenz Michel Pruss , Supra, In re Gervitz Carbonell, Supra.*

37.     With regards to a lawyer admitted to practice law in Puerto Rico, the PR Supreme Court warns of how they must be zealous of not letting the illegal practice of law in Puerto Rico and thus dedicates an ethics canon, specifically Canon 33 that says: "a Lawyer has the obligation to avoid the illegal practice of law or notary practice by persons not authorized to do so. It will be improper for a lawyer to allow or facilitate a person or entity that is not authorized to practice law or notary practice to charge in whole or in part for the professional or notarial services provided by the lawyer. It is also improper for a lawyer or legal firm to allow persons not authorized to practice the profession of lawyer or notary in Puerto Rico to provide any type of legal advice to clients of the lawyer or legal firm even when said persons do not have to appear for this purpose. to the courts. This does not prevent the lawyer or legal firm from seeking advice from a person not authorized to practice law in Puerto Rico to provide better service to their client. It will be improper

for a lawyer to enter into a partnership with a person who has not been authorized to practice law or notary practice when any of the activities of the partnership involve the practice of law or notary practice." 4 L.P.R.A. Ap. IX.

38.    Defendants were aware that they were acting illegally because they had already been involved in a complaint for such conduct. See: Jimenez ethical complaint AB-2018-0011.

**B. The Plaintiffs were Trying to Recover their Losses from the PR Bonds and PR Closed End Funds Debacle**

39.    Since 1995, UBS Financial Services PR, Inc. (herein: "UBS PR") and UBS Financial Services Puerto Rico, Inc. (henceforth collectively: "UBS") have been the primary underwriter and sole manager of fourteen separately organized closed-end fund companies' CEFs with a total market capitalization of $4 billion, and co-manager of nine closed-end fund companies' CEFs with more than $1 billion in total market capitalization. The CEFs are not traded on an exchange or quoted on any quotation service and are available only to Puerto Rico residents. The majority of the CEFs' holdings are Puerto Rico municipal bonds, a substantial amount of which UBS PR underwrote. UBS PR has been the only secondary market dealer or liquidity provider for the sole-managed Funds and the dominant dealer for several co-managed CEFs and has effectively controlled the secondary market for all CEFs.

40.    UBS PR marketed CEFs primarily to retail customers. Many CEF investors were seniors and retirees, and a number of them depended on monthly dividend income from the CEFs to supplement their payments from Social Security.

41.    Unknown to Plaintiffs, though, in 2008 and 2009, the pricing of CEFs was left to the discretion of UBS PR who priced the CEFs to reduce volatility and maintain high premiums to Net Asset Value (NAV), and not at market value. The pricing was driven in part by the need to

keep the "dividend reinvestment program" an attractive feature and not based on market forces (i.e. demand and supply). UBS PR used the CEF inventory account to purchase any excess supply of shares for which UBS PR could not find customers, thus creating the false illusion of a market.

42.    The UBS' and Broker Dealers' fraudulent scheme was successful for many years. The Investment Banks would underwrite Puerto Rico debt and charge fees, then sell the PR Bonds to their clients and charge a fee and place the bonds in the different PRCEFs and charge a fee and sell the PRCEFs to their clients and charge commissions and administrate the PRCEFs and charge an administration fee and fees for trust services, all the while creating a fictitious demand for PR Debt.

43.    On the other hand, Puerto Rico had been in a recession since the year 2006. Since then, the Puerto Rico debt growth continued to outpace economic growth. In the past, during the period of rising interest rates (2004-2006), and the global financial crisis (2008-09) there were repeated periods of imbalance in the secondary market for both PR Bonds and CEFs. Throughout those times, the Broker Dealers and especially UBS were able to control the market illiquidity and price's volatility by increasing its inventory to as high as $50 million, and by preventing sales through the use of the Loan scheme. During the year 2012, it was the securities market analysts' general consensus that PR's outstanding debt in the range of $60 billion was unsustainable; and, that, although some of the PR Bond issuers have dedicated revenue streams, their creditworthiness is inextricably intertwined with the PR fiscal health.

44.    On December 2012, UBS Research predicted that in 2013 the PR GO's, that were two steps above Junk, but still "investment grade", were to be downgraded. On December 2012, UBS Research also predicted that in 2013 Detroit was to declare itself insolvent and file Bankruptcy. The next day, December 13, 2012, Moody's downgraded Puerto Rico general obligation and

related bonds to Baa3 from Baa1, that is one step above "Junk" and certain notched bonds to Ba1, or "Junk". Since then, any holdings of PR securities turned out to be highly speculative and appropriate only for high- risk tolerant and sophisticated investors. Broker Dealers were also informed of this.

45.      In response to the foregoing forecasts, during the year 2012 and forward, the Broker Dealers acted to reduce their financial risk exposure to the PR securities. On the other hand, they passed those financial risks to the Plaintiffs when, during the regular meetings they had with them throughout that time, during the year 2012 and forward, and until the market crash, they continued to explicitly recommend the same investment strategy. That is, to continue to purchase and hold the PR securities. To do that, the Broker Dealers explicitly encouraged the FAs, under threat of being fired, that in their sales' meetings with their clients, they had to over represent the PR securities' tax advantages, high returns and past performance, and to omit any discussion, deny or downplay any concerns regarding the PR securities', such as their low liquidity, excessive leverage, oversupply and instability and poor creditworthiness.[5]

46.      Even after the market crash, in August of 2013, the Broker Dealers continued to recommend to their clients the same investment strategy, arguing that the value of the PR securities would soon rise again. This is after the victims of the PR Bonds and PR CEFs debacle had lost around half of the money invested in these securities and in some instances loosing from 80% to

---

[5] The FAs were concerned because many of the CEFs were loaded up with debt of the Puerto Rico government and related entities that was underwritten by UBS. At the meeting, Miguel Ferrer informed the FAs that their views were unacceptable, that their clients had around one billion in cash in their accounts, and that they either change their mindset, and start selling the CEFs to their clients or leave UBS. With his speech, Ferrer explicitly incited the FAs, under threat of being fired Exclusive: Recording shows how UBS drove reluctant brokers to sell high-risk Puerto Rico funds By Suzanne Barlyn, Fri Feb 6, 2015 3:51pm EST: http://www.reuters.com/article/2015/02/06/us-ubs-puertorico-tactics-idUSKBN0LA0FN20150206, Audio Links for Ferrer recording: http://mediacdn.reuters.com/media/us/editorial/assets/FERRER.mp4, Audio Links for Ramón Almonte recording: http://mediacdn.reuters.com/media/us/editorial/assets/RAMON.mp4

all of the money in cases where the accounts were leveraged, or more than $2 BB of capital from the Puerto investment accounts. The Broker Dealers, thereby, breached the fiduciary and suitability duties that they owed to their clients and defrauded them when they had them incur and maintain said investment strategy, and causing huge economic losses to the Plaintiffs.

47.    During more than 50 FINRA Claims taken to final hearings, heard completely through closing statements and to all extents and producing awards, these facts were in evidence and provided those victims who were claimants in FINRA with recovery in the immense majority of them.

**C. Puerto Rico debt is Financed through the Issuance of Bonds by the Broker Dealers**

48.    The PR Bonds are financial instruments of debt used by the Government of Puerto Rico, its agencies and Public Corporations to finance their commercial operations. These securities have a maturity date where the buyer should receive the return of the money borrowed and most of them pay a fixed monthly yield or interest. The Government of Puerto Rico guarantees the payment of the monthly yield and of the principal at maturity.

49.    The causes for the 2013 market crash were linked to their lack of liquidity and the foreseeable PR's declining economy and increasing governmental debt that was well known in the industry, because the Broker Dealers and Investment Banks kept underwriting, issuing PR Bonds and placing them in PR CEFs and their customers' investment accounts. "Structural problems, economic shocks and weak public finances have yielded a decade of stagnation, outmigration and debt in PR. Financial markets once looked past these realities but have since cut off the Commonwealth from normal market access."[6] For example, PR "[p]ublic sector debt has risen

---

[6] Krueger, Teja, And Wolfe, The Cause of PR Economic Crisis in a Nutshell, Executive Summary ("Krueger Report"), June 29,2015, p. 1.

every year since 2000, through good years and bad ones, reaching 100 percent of GNP by end---FY 2014."[7] As of the year 2010, PR's debt represented over 90% of its GNP.

50.     The fore stated lack of demand for PR securities was a natural consequence of market saturation and concern about their increasing risks because of their poor credit quality, illiquidity and potential default. The Broker Dealers knew that demand for PR debt was no longer there and, because some of these bonds and PRCEFs could only be bought by PR residents, any selling pressure would trigger a crash, so they decided to delay the crash as long as they could and that way keep on profiting from these instruments. On August 8, 2011, Moody's Downgraded PR GO's to Baa1 from A3, with Negative outlook.

51.     By mid-2012, the risks were already evident for the PR Bond market. With a view to these risks, on July 27, 2012, the Company Janney Capital Markets released its report: "Puerto Rico's Debt Overload". The report concluded that: PR outstanding debt was "in the range of $60 billion; "[t]he pace of debt growth exceeds that of economic growth, an unsustainable proposition"; that although some "of the issuers have dedicated revenue streams, the creditworthiness of most is inextricably intertwined with the fiscal health of the Commonwealth"; and that "[i]nvestors [we]re cautioned to limit portfolio exposure to Puerto Rico bonds, with 10% concentration recommended ceiling for risk tolerant investors, and much lower levels appropriate for most".[8]

---

[7] *See*, *Krueger* Report, p. 9

[8] On November 2012, U.S. Trust Market Research, the research division of U.S. Trust, Bank of America Private Wealth Management, issued a Special Report about PR credit concerns where it concluded that although PR Bonds were still investment grade, for all relevant purposes they should be viewed as Junk (below investment grade or high yield) and, were being traded as such, based upon its "analysis of its economy, finances, debt and pensions." This Special Report was emailed by UBS PR to its top Management personnel, including to Carlos Ubiñas, then CEO; Doel R. Garcia, Wealth Management, Managing Director;  Eugenio Belaval, Vice-Chairmen; and Miguel A. Ferrer, Chairman; with express instructions to read the foregoing conclusion and under the following heading: "Subject: FW: Puerto Rico Credit Concerns. Internal Only. Do not distribute - Importance: High".On December 12, 2012, UBS Wealth Management Research, in its Municipal Market Guide entitled 2013: On the horizon, predicted that in 2013 the PR GO's, that were two steps above Junk, were to be downgraded.

52.    In August 2013, the weekly Barron's published a frontpage of the Puerto Rico economy in decline and the exposure and danger this represented to the mutual funds in the Nation. Exacerbated by the mass sale of holdings of bonds by mutual funds, 2013 proved to be the worst year for these securities. The Caribbean Business reported that in September 2013 local investors had suffered losses in PR Bonds and CEFs by more than $2.25 billion. In February 2014 the three credit rating companies had downgraded the debt of Puerto Rico to "junk", which turned them unsuitable for investment and speculative.

53.    In December 13, 2013, Moody's downgraded Puerto Rico general obligation and related bonds to Baa3 from Baa1, that is one step above "Junk" and certain notched bonds to Ba1, or "Junk", and with a negative outlook.[9] Moody's explained that the reason for degradation was the long and incurable suffering PR recession and its high and unsustainable level of debt. Although the PR GOs still were investment grade, for all relevant purposes they were equal to junk because of PR's high unsustainable debt, high unbearable expenses, poor stagnant economy, and severely unfunded ERS. Since then, any holdings of PR securities turned to be highly speculative and appropriate only for high-risk tolerant and sophisticated investors.

**D. The Closed End Funds of Puerto Rico**

54.    The CEFs are investment funds created by corporations organized under the laws of Puerto Rico, with the approval of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF"), that require that 67% of the Funds' assets are invested in PR Bonds. The

---

[9] Upon degradation by Moody's, in March 2013, Standard & Poors ("S & P") and Fitch Rating Services ("Fitch"), the other two companies that evaluate credit quality, followed and also downgraded Puerto Rico debt. On June 19, 2013, Ben Bernanke, then President of the Federal Reserve, announced a decrease in the policy of easy access of money known as QE that also put pressure on bond markets since it potentially meant rising interest rates. Following this announcement, in late June S & P revealed that Puerto Rico was the worst country in the field of municipal debt, which caused a decrease of 7.63% in the Municipal Bond Index of PR in just one week. Finally, as a red flag, in July 2013, the city of Detroit filed for protection of the Bankruptcy Laws. News reports continuously spoke about said bankruptcy, the Puerto Rico debt, and that Puerto Rico was the next municipal bond market in danger of default.

Funds are considered a pass-through entity that is supposed to distribute about 90% of their income to be considered as tax-free dividends. Because of these requirements, the CEFs invest at least 67% of their capital in PR Bonds and the other 33% mostly in municipal bonds of U.S. agencies fixed-rate long-term maturities. The CEFs invest their capital in bonds that produce exempt interest income, and dividends paid to shareholders of the CEFs are represented as tax exempt to residents of Puerto Rico. The basis for the exemption seems to be a no-action letter. By their nature and investment requirements, the CEFs are very similar to each other because they invest their capital in similar securities and they all have very similar investment portfolios.

55.     According to the prospectus of the CEFs' investment objective is to provide investors "current income consistent with preservation of capital" "and that they are suitable only as part of a diversified investment portfolio". As part of the regulations adopted by OCIF the CEFs are not supposed to concentrate their investments in bonds of low quality or in any given institution. The Funds' prospectuses also stated the funds were not permitted to "concentrate [their] investments, e.g. invest a relatively high percentage of [their] assets in Municipal Obligations (e.g. revenue PR Bonds) issued by entities which may pay their debt service obligations from the revenues derived from similar projects, such as hospitals, multifamily housing…." without explicit authorization of the Board of Directors and prior written approval from the Funds' shareholders. Thus, while the CEFs were permitted to invest up to sixty-seven (67) percent of their total assets in tax-exempt securities issued by the Commonwealth of Puerto Rico, they were not permitted to concentrate their holdings in a single issuer's low quality PR Bonds.

**E. The Broker Dealers' Role in The Underwriting and Management of The CEFs**

56.     UBS-PR is the major underwriter of PR Bonds. UBS-PR also acted as the managing underwriter in the initial public offerings of the shares of twenty-nine (29) CEFs with a total market

capitalization of approximately \$5 billion. Seven funds, begun between 1995 and 1999, that were co-managed with Popular Securities,[10] and 16 funds begun between 2001 and 2008 that were sponsored solely by UBS-PR, UBS-PR and its affiliates manage most of these CEFs.[11]

57.    The members of the Boards of Directors and/or Boards of Advisors of the CEFs are selected and appointed by UBS-PR and/or Popular Securities and they exercise *de facto* control over the CEFs and their investments. UBS-Del exercises *de facto* control over UBS-PR.

58.    With each PR Bond issuance, UBS-PR, Popular Securities and other Broker Dealers' underwriters charged multi-million dollar fees for their role in bringing the PR Bonds to market, but they then packaged these bonds into CEFs, and sold the CEFs' shares to PR investors under the guise that they were buying secure fixed income PR Bonds. The CEFs have generated and generate approximately fifty per cent (50%) of the total gross revenues of UBS-PR, and represent the largest single source of revenues for UBS-PR.

59.    In a press release on October 9th, 2014, OCIF notified that it had conducted an examination of "the operations of UBS Financial Services Incorporated of Puerto Rico which covered the period from January 1st, 2006 through and including September 30, 2013. After analyzing the data collected, OCIF became aware, by means of interviews of a representative sample of clients with a conservative risk tolerance profile and with a significant level of their liquid

---

[10] Popular Securities and **UBS-PR and their affiliates** co-manage at least the following CEFs: Puerto Rico Investors Tax-Free Fund; Puerto Rico Tax Free Target Maturity Fund; Puerto Rico Investors Flexible Allocation Fund-Income Portfolio; Popular Income Plus Fund; and Popular High Grade Fixed-Income Fund.

[11] These Funds include: Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income V, Inc.; and Puerto Rico Fixed Income Fund VI, Inc.

net assets invested in PRCEF, that UBS may have permitted or recommended such clients the use of "nonpurpose"' loans for the purchase of additional PRCEF, **an ineligible activity for 'non-purpose' loans**. Additionally, OCIF observed apparent irregularities in the management of some of these client's accounts and lack of adequate record keeping and diligent supervision by UBS of its agents." (Emphasis supplied).

60.    Despite the risks posed by Puerto Rico government debt, UBS packed the CEFs with hundreds of millions of dollars of these PR Bond high-risk securities. Even worse, the Broker Dealers and other Broker Dealers concentrated the Funds' portfolios of their proprietary CEFs in the securities of only a few government issuers.

61.    The concentration of risk in the Funds' portfolios would normally have been prohibited by the Investment Companies Act of Puerto Rico, which set a maximum threshold for investment in a single issuer of 25% of a portfolio at the time. But Broker Dealers were able to exceed the customary threshold by obtaining a waiver. As a result, the Funds were even **less diversified** and therefore of **higher risk** than contemplated by the Investment Companies Act of Puerto Rico.

62.    The PR CEFs had a geographical concentration of at least 67% of their capital in PR Bonds that, as of the year 2012, the vast majority were, for all relevant purposes, equal to high yield, or Junk Bonds. The Investment Act generally requires funds to have 300% asset coverage, and can thus borrow only one dollar for every three dollars of capital. On the other hand, the CEFs are allowed to borrow one dollar for every dollar of capital. Using leverage, the Funds are able to hold twice the amount of assets as the amount of equity. Interest rates are significant to the Funds because they mainly use short-term financing and the difference between the return on assets and the cost of funding is the amount of dividends the Funds can pay.

63.    CEFs leveraged their respective investment portfolios by financing approximately one half of their total assets. Said leverage permitted the CEFs to purchase and hold securities with an aggregate market value equivalent to approximately two hundred per cent (200%) of their aggregate net worth, with the concomitant risk. For every dollar invested, a Fund can buy two dollars of securities with the second dollar of purchases financed with borrowed funds. Funds similar to the CEFs existing in jurisdictions of the United States of America other than Puerto Rico use less leverage than the PR CEFs, and their average debit or loan payable balance is equivalent to approximately twenty-two per cent (22%) of the market value of their total assets. In other words, the CEFs use more than twice the leverage than similar closed-end mutual funds in jurisdictions of the United States other than Puerto Rico.

64.    The highly leveraged structure of the CEFs significantly increased the risk of massive losses for the investors. Because the Funds had an approximately 50% leverage ratio, a 20% decline in the value of the CEFs' assets would cause the Funds, and, thus, the investors to suffer a 40% loss. If the investors had also used leverage in their accounts as most of they did following Broker Dealers' explicit recommendations, their risk and potential losses further multiplied by the leveraged ratio.  Thus, the CEFs were structurally predisposed and caused enormous losses in the investors' portfolios that were over concentrated in them, and more so if they had used leverage, in the event of interest rates declines or credit downgrades such as those that took place.

65.    UBS, Santander and Popular are the **only** secondary market dealers of the shares of their proprietary CEFs. Any secondary market sales investors wanted to make depended largely on Broker Dealers' ability to solicit additional customers or willingness to purchase shares into its inventory.

66.     The dangers and risks of over-concentration are not concepts that were created by clever Claimants' attorneys after an unexpected loss in value in the Puerto Rico municipal bond market. These risks and dangers were emphasized for years by the broker dealers' own Compliance and Supervisory Manuals, risks which must be considered in a suitability analysis and generated great losses to their customers from which they were trying to recover through hiring attorneys such as Defendants to file claims in FINRA.

**F. FINRA and Arbitrator Training on Theories of Damages**

67.     The Costumer agreements that Plaintiffs had to open their accounts at a Broker Dealer included an arbitration clause that usually even specified the dispute resolution forum to take their claims or disputes to, as FINRA Dispute Resolution.

68.     FINRA trains its arbitrators in several areas including damages and how to calculate them and apply different damages theories. Nevertheless, FINRA does not specify a particular theory of damages to be applied and instead, lets the arbitrator exercise their independence to choose which theory of damages to apply depending upon the circumstances of each case, their claimants and the evidence displayed in the hearings generally.

69.     FINRA is an equity forum. That means that the arbitrators resolve by compromising and not strictly by the letter of the law.

70.     Among the theories of damage that are more popular are four. The first is the actual capital loss, which is arrived at by looking at the value of the accounts from a certain point in time and subtracting the value at the end of the period. The difference will be the capital loss or capital gain in the account. To figure this out, the new additions and withdrawals, if any of assets has to be accounted for during the period.

71. The next theory of damages widely used is the Net Out of Pocket ("NOP") theory. NOP accounts for the capital loss and subtracts the income and capital gains during the period to arrive at a net figure of damages.

72. The third most popular theory of damages is known by various names: Benefit of the Bargain ("BOB"), or Market Adjusted Damages ("MAD") or Well Managed Portfolio ("WMP") which tries to provide a picture during the period of what would have happened if the money had been invested in a suitable manner according to the investor's profile and risk aversion, and, although based on the actual account statement numbers, it is a hypothetical figure.

73. The fourth is Disgorgement. "[D]isgorgement[] prevents a defendant from profiting from his securities violations." *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003). "No statute governs the disgorgement of ill-gotten profits -- rather, principles of equity provide the foundation for this penalty." *SEC v. Happ*, 295 F. Supp. 2d 189, 197 (D. Mass. 2003). See, also, *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965) ("It is simple equity that a wrongdoer should disgorge his fraudulent enrichment."). "Courts often note that the primary purpose of disgorgement is the prevention of unjust enrichment -- that is, that those who have violated the securities laws are not allowed to gain by their illegal conduct. Accordingly, disgorgement is a powerful deterrent against misuse of material, non-public information." *SEC v. Happ*, *Supra* at 197 (collecting cases). "Disgorgement is remedial rather than punitive, since a fundamental policy underlying disgorgement is to prevent the unjust enrichment of the wrongdoer rather than to punish him." *SEC v. Grossman*, 1997 U.S. Dist. LEXIS 6225, at *27 (S.D.N.Y. 1997). FINRA guidelines expressly grant the arbitrators the authority to grant disgorgement remedies: "[t]he arbitration panel may require the respondent to disgorge profits or commissions. The goal of disgorgement is to make the wrongdoing unprofitable and therefore deter the wrongdoing. Disgorgement might be

available even where the claimant has not suffered net out-of-pocket losses." Arbitrator's Guide, p. 64.

74.     Among these four most popular theories of damages, arbitrators select which or a combination of which of the four to apply or other measures of damages. The parties all plead their take on which theory should apply, but arbitrators are free to choose which to apply if any without having to explain why or even tell how they arrived at a damages number when they find for a party.

**G. Net Out of Pocket**

75.     The theory most advantageous to the broker dealer respondents because it is the one that usually will yield the lowest compensation for a claimant is the Net Out of Pocket theory of damages ("NOP"). This theory is based on Trust Law. The basis for this theory is found in Restatement Second of Trust Law under "netting". It states in essence that a fiduciary who breaches fiduciary duty is responsible for the damage caused by his breach, but the fiduciary can reduce his responsibility (liability) by all the income, dividends, and gains that were also a product of his breach.

76.     Throughout a hearing, the broker dealer respondents usually argue that the Claimants' losses should be reduced by the income that came into the accounts for the prior years going back as far as the inception of the account. This analysis is flawed for a number of reasons.

77.     First and foremost, because the Netting of losses as described by Restatement Second of Trust Law allows netting to favor a fiduciary who breached his fiduciary duty of the profits and/or income that is produced by his breach to reduce the losses created by such breach, therefore, the period of time cannot be the period of time before or beyond that for which the fiduciary duty was breached.

78.     Under the Restatement (Second) of Trusts, § 213, a trustee who is liable for a loss due to a breach of trust cannot reduce his liability by deducting the amount of a gain accrued through another distinct breach of trust. However, if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting from them. A fiduciary is liable for the total aggregate loss of all breaches of trust and may reduce liability for the net loss of multiple breaches only when such multiple breaches are so related that they do not constitute separate and distinct breaches. *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt*.

79.     Also, and most prominently, Net out of Pocket ignores the alleged objective of the CEFs – "income consistent with the preservation of capital." This objective similarly applies to the bonds sold to Claimants – bonds are to pay a fixed income and pay back the principal at maturity. The broker dealer respondents sold these funds and bonds to the Claimants claiming that they would provide income and preserve capital. The preservation of capital objective failed resulting in extraordinary capital losses. Accordingly, the Claimants should be entitled to their lost principal/capital, and not be forced to offset those principal losses with interest/dividends earned years prior. After all, what is expected of a fixed income investment is that: income for living expenses and the return of capital at maturity.

80.     Moreover, "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach -- not simply to compensate for damages in the event of breach." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995-96 (2d Cir. 1983). "[T]he function of [an action founded on breach of fiduciary duty] is not merely to compensate the plaintiff for wrongs committed by the defendant but 'to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have

undertaken for others, or to which their agency or trust relates." *Diamond v. Oreamuno*, 24 N.Y.2d 494, 248 N.E.2d 910, 912, 301 N.Y.S.2d 78 (N.Y.1969)

81.     Additionally, the broker dealers themselves believe that principal loss is an appropriate measure of profits or losses in a security as displayed by their monthly statements which list principal profits/losses for each security, but do not list net out of pocket profits/losses.

**H. Defendants' Enterprise**

82.     The Defendants are part of a group of attorneys and law firms that usually descend upon a jurisdiction when some sort of malfeasance has occurred like that narrated herein, to capitalize on signing up clients in their claim for remuneration of their losses in the investment instruments. Defendants have touted how they are especially suited for such Claims in their marketing and their websites.

83.     Defendants purportedly held more than four conferences activities with hundreds of potential claimants who lost millions of dollars with the PR Bonds and PR CEFs debacle. These were held in hotels where they would give out legal advice on the possible claims and sign-up potential customers, representing that they were legal representatives specializing in securities' fraud claims and the best alternative for remuneration in Puerto Rico. Mr. Klayman nor Mr. Toskes mentioned anywhere that they were not admitted at the PR Bar, and that they would have to apply individually for each case to be admitted by courtesy in Puerto Rico to be able to advise and represent such clients.

84.     Defendants communicated through email and US Post Office mail and used the phones and mail services to communicate with clients and provide them with legal advice, that unbeknown to them they were not authorized to provide. Defendants used mail, bank and wire services to pay for filing fees, expenses like expert witness fees and FINRA forum fees and would

pay the Claimants like the plaintiffs though mail and wire services like bank wire transfers and would use the banking system to carry accounts to be able to get deposits and payments and to pay their clients and their expenses and used their banking accounts and wire services to distribute to themselves and to the enterprise the legal fees that had been obtained through their illegal practice of the profession in Puerto Rico.

85.    The Claims in FINRA were filed electronically through the FINRA DR Portal. FINRA estimated that the claims filed from all the victims of the PR Bonds and PR CEFs debacle were more than 3,000 and in settlements and awards the Broker Dealers paid close to $1BB. The Claims handled by Klayman Toskes are estimated to be around 500 claims in FINRA and between awards and settlements it is estimated that they recovered around $24M and charged and where paid around $8M in contingency fees. It is also estimated that they failed to provide close to $600,000 in *pro hac vice* admission fees to the Puerto Rico Supreme Court at $800 per attorney per claim.

## I.    Mediations and Settlements

86.    After the normal process of interviewing the clients, gathering clients' records, statements, evidence and information, the process requires the filing of a Claim in FINRA or in any other applicable forum like state-court or District Court, and once discovery has been carried out, the case is ready for a mediation.

87.    Under the statutory scheme, "mediation" means a process in which a neutral person or persons facilitate communication between the disputants to assist them in reaching a mutually acceptable agreement, and "mediation consultation" means a communication between a person and a mediator for the purpose of initiating, considering, or reconvening a mediation or retaining the mediator. Cal. Evid. Code §1115(a), (c). The scheme applies to all mediations, with limited

exceptions. Cal. Evid. Code § 1117. Mediation is an optional step in FINRA and one that does not obligate those who submit to it except to confidentiality. Mediation saves time, money and effort for the parties by trying to solve the claim without formal hearings. Nevertheless, this step was used by Defendants as part of their enterprise, promoting the illegal conduct described herein in the furtherance of the enterprise and in contravention with interstate commerce.

88.    Defendants would schedule a mediation whereby they would try to settle each case. Normally, it is the best practice that the Claimants be present at a mediation to be able to understand their case's pros and cons and to provide authorization for a settlement or to go ahead with an arbitration hearing in an informed manner. As a consideration for an informed decision, in Puerto Rico, language differences make it necessary to have translators ready to help. The Supreme Court of Puerto Rico, therefore, make it obligatory for local admitting or sponsoring counsel to be present at all times with the *pro-hac-vice* admitted lawyer to be able to practice.

89.    It is normal to carry such mediations very near the date that the hearings are scheduled for, because at that point most if not all discovery has been carried out and parties are in the best position to handicap their chances to prevail and to know what their exposure is and what the real damages are.

90.    The enterprise also entailed organizing these mediations, normally through a mediator. Mediators assist and guide parties toward their own resolution. A mediator does not decide the outcome.  Instead, a mediator is a neutral who helps the parties understand and focus on the important issues needed to reach a resolution ideally. FINRA's mediators have securities expertise that helps them assess the strengths and weaknesses of each side's case.

91.    Mediation Ground Rules—FINRA Rule 14109 states that Mediation is voluntary, and a party may withdraw from mediation at any time before executing a written settlement

agreement. The mediator acts as a neutral, impartial facilitator of the mediation process and has no authority to determine issues, make decisions, or otherwise resolve the matter. Rather, the mediator's role is to facilitate—through joint sessions, private party caucuses, and/or other means—discussions between or among the parties to assist them in resolving the matter. *Unlike the prohibition against *ex parte* contact of an arbitrator by a party, a mediator may meet and communicate separately with each party or the party's representative in advance of the mediation but must notify all other parties of any such separate meetings or other communications.

92.     FINRA Mediators must conduct mediations in accordance with FINRA procedures, the Code of Mediation Procedure and the provisions of the Standards of Conduct for Mediators. Mediators are usually also Arbitrators, because that experience helps them in their communication with the parties to a mediation and to be able to handicap each particular case to be best prepared to advice claimants and respondents of the risks and possible outcomes if a case were to go to arbitration. Mediators must conduct the mediation in a fair and unbiased manner and decline or withdraw from a mediation if the mediator cannot remain impartial. Mediators must avoid a conflict of interest or the appearance of a conflict of interest during and after a mediation and maintain the confidentiality of a mediation. But their mission involves the clear and understandable communication with the parties and explaining unbiasedly circumstances particular to each Claim.

93.     Parties that agree to mediate often request a list of available mediators, which will include the Mediators' Disclosure Reports. The report provides parties with valuable information to help them decide who they would like to mediate their case. FINRA mediators are required to keep the information on their disclosure reports current using DR Portal.

94.     The enterprise entailed using the same mediator for most of the mediations. As one of those mediators often used by Klayman and Toskes, Mr. Robert D. Herschman (herein:

"Herschman"), was one who supplied them with their services because he was versed in Spanish. Mr. Herschman had the obligation of obtaining submission to Mediation of all Claimants subject to a mediation and had an obligation to act as a neutral and as such, advice without bias of the different scenarios for Claimants under the circumstances of their particular claims.

95.    Mr. Herschman describes himself on his website as: "Robert Hirschman is a seasoned attorney with over 30 years' experience practicing real estate and business law. As a former business executive in both the U.S. and the United Kingdom as well as a former Judge *Pro Tem* on the Los Angeles Superior Court, Robert offers his clients the unique perspective of having sat on both sides of the bench and the table. Through the years, he has represented a great number of clients and successfully litigated a wide range of business, real estate and intellectual property cases.

96.    Mr. Herschman states in his website that: "Since 2004, Robert has also maintained a successful mediation practice -- resolving disputes involving all manner of business and real estate agreements, from partnerships and corporate shareholder agreements to agreements involving financing and security interests in real estate, easements, construction defects and escrow and title litigation. Early in his career, Robert represented numerous prominent recording artists as a partner in a law firm specializing in the music industry. His firm's work included negotiating recording and publishing agreements, litigation involving copyrights, trademarks, trade secrets, unfair competition, and all aspects of intellectual property except patents. He later established an entertainment business consultancy and managed the creative careers of several high profile rock musicians. With an expertise in several practice areas cultivated over a more than 45-year career, Robert Hirschman brings an unrivaled breadth of knowledge and experience to the clients he serves. In addition to critical and creative thinking, Robert offers 'true counsel' --

conveying deep concern for the client's business and personal welfare. He instills confidence in the process and minimizes the client's stress levels during challenging times through patient listening, empathy and positive, timely and pragmatic responses. His recommendations always get to the heart of the matter -- and to a resolution.[12] Mr. Herschman was profiled by FINRA and was described in 2013 as the highest paid arbitrator receiving compensation as an arbitrator for $387,000."[13] Mr. Hershman is not admitted to the PR Bar.

97.    The enterprise required putting together a bunch of relatively small claims and a large one to favor the large one despite the small ones to be able to rack up fast and easy contingency fees. The enterprise entailed the misinformation to the Claimants that were defendants' clients and that were expecting unbiased advise and misleading them into undervaluing their Claim to accept less than the Claim was worth and then charging legal fees that Defendants were not entitled to because of their illegality of practicing the legal profession without authorization, conduct bound to be repeated and that used mail and wire services in their furtherance of the enterprise and interfering with interstate commerce.

98.    The enterprise also required that a mediator cooperate in providing the platform for the bullying and misrepresentation practiced by Defendants. They misled the PR Victims of the PR Bond and PRCEFs debacle, that their case was weak to convince them to accept a low settlement, to achieve the goals of the enterprise.

99.    Mr. Hershman was also accustomed to substituting his criteria for that of the Supreme Court of Puerto Rico that always required a PR attorney present when the admitted

---

[12] http://www.hirschmanlaw.com/aboutroberthirschman.html
[13]    https://www.regcompliancewatch.com/finra-s-war-chest-falls-a-bit-yet-tops-1-7-billion-salaries-and-revenues-increase/

attorney does not know Spanish and yet, would excuse the local counsels by letting them know that they had to be available by phone. See *In Re: Klayman Toskes* AB-2018-0011

100.    In their conspiracy, as displayed by the conduct and tactics used against the plaintiffs, the defendants would use the NOP theory of damages subtracting all the income generated since the inception of the accounts to make their clients believe that they had actually a profit or very little loss in their accounts. This in turn was meant to make a very small transaction number the right measure of compensation for them and not the correct one. After all an investment made to generate income with the expectation of receiving at a maturity date the capital invested back should not be considered anything else.

101.    In essence, the NOP number should have been measured by netting the income produced in the accounts from the moment when the breach of fiduciary duty occurred which was generally from December 2012 when no conservative or moderate investor should have held more than 10% concentration in Puerto Rico bonds, much less leveraged and illiquid PR CEFs. Through their enterprise, defendants were misleading the Plaintiffs into thinking that their losses were a lot less than they actually were by subtracting the income from their investments since the account inception and not from the moment the breach of duty occurred.

102.    This enterprise affected interstate commerce as these mediations were carried out in different states and in Puerto Rico and is bound to be repeated and that together with the illegality of the defendants' conduct were the proximate cause of their damages.

**J. THE PROSCRIBED ACTS:**

**(a)  The Jimenez' Victimization at the hands of Defendants**

103.    The Jiménez signed a retainer with Klayman Toskes to take their Claim to FINRA versus UBS on March 26, 2015, after an orientation activity in and around February of 2015 and

their Statement of Claim was filed in FINRA with number: 15-02051 in August of 2015 after

Toskes asked the Jiménez to sign an approval of the Statement of Claim ("SOC") through an email,

Toskes asked:

> "As a matter of fact, before filing your claim we sent you an approval form
> which stated in part, *"Aunque no estamos facultados para hacerle recomendaciones
> sabre inversiones, desde un punto de vista legal, es mejor para su caso demostrar
> que está intentando vender unas inversiones que estamos alegando son
> inadecuadas."[14]* You signed this document on August 4, 2015, acknowledging you
> had read this disclosure. *See* SOC Approval Form, marked as Exhibit 6. However,
> you still chose to keep the investments."

104.    After the selection of an arbitrator panel by the process of ranking, and after

conducting discovery and a damages study, Defendant Toskes wrote a letter to the Jiménez

discussing the law as it affected their Claim and why they did not have a strong case to take to an

arbitration hearing in his opinion. In that letter dated December 20, 2017, Toskes concluded:

> "As you can see, there are many factors to consider before deciding to move
> on to the final hearing. The combination of your portfolio's performance, the
> composition of your arbitration panel, the testimony UBS could present and,
> perhaps most importantly, the fact that you rejected a sale recommendation in 2014,
> fired UBS and transferred your account to Oriental, and are still holding these
> investments, suggest that you should still explore the possibility of a settlement
> agreement for an amount less than $ 1,000,000. Our goal is always to get our clients
> the highest amount of money with the lowest level of risk. However, it is our duty
> to provide you with all the pros and cons of attending a final hearing, so that you
> can make an informed decision. We strongly encourage you to consider all the
> elements set forth in this letter, and consult with another attorney to get a second
> opinion on our evaluation of your case. We do not believe that your valuation is
> reasonable and it is very likely that an award will be for a lot less than $1,000,000.
> Please let us know if you have any questions, and let us know how you desire to
> proceed.
> Sincerely,
> /s Steven D. Toskes"

105.    The first mediation for the Jimenez was carried out without their presence and they

were informed that their case was very weak, even though they had more than $1.2 million in

---

[14] "Although we are not authorized to make investment recommendations, from a legal point of view, it is better for
your case to demonstrate that you are trying to sell investments that we are alleging are unsuitable."

losses. Defendants alluded to a figure called Net Out of Pocket or "NOP" to say that they had actually not lost any money but had actually made money in their PR investments whereas their capital losses were more than $2,000,000. They also stated that UBS had offered $25,000 in consideration for dismissing the claim. The Jimenez' were incensed.

106.    As the hearing dates were upon them, defendants adjourned the dates to carry out another mediation, again without the Jimenez' knowledge. Another mediation was carried out afterwards with the benefit of the Jimenez' presence in Florida at their expense at which time another offer was transmitted by Mediator Robert Hershman. Defendants then sprang into action with their enterprise and threatened the Jimenez saying that their appreciation of their claim was very weak because their Net Out of Pocket damages were very low. Defendants were reducing the capital losses by the dividends and interest income in the accounts since inception and not from the date of the breach as they should have. That they would not take their case to hearings if they did not accept the settlement offered. This offer for around $200,000 was also not accepted by the Jiménez and at this point they decided to take their Claim and case elsewhere. At this point Defendants fired the Jimenez Plaintiffs as clients.

107.    Klayman Toskes did not want to give the Jimenez their file and the Jimenez filed a Complaint in the Supreme Court of Puerto Rico. After that, the Jiménez found out that neither Klayman nor Toskes had applied for courtesy admission in PR. Nevertheless, on January 25, 2018, Defendants claimed that they were owed $60,000 in contingent legal fees over the settlement offer of $200,000 and $14,394.20 for costs incurred in the matter without receipts nor invoices for such.

108.    In their complaint with the Puerto Rico Supreme Court the Jimenez made a sworn statement that translate as follows:

> On March 26, 2015, the plaintiffs here, Salvador Jiménez and Raquel Benito de Jiménez, hired the services of the Law Firms Klayman & Toskes, P.A., and Carlo

Law Offices, P.S.C., to represent us in a case against UBS for reasons of the fall of the Puerto Rico Closed Fund and Bond market that occurred in 2013.

Attorneys Steven Stokes and Lawrence Klayman have their offices in the State of Florida, and Attorney. Osvaldo Carlo in Puerto Rico. Pursuant to the contract between the parties, the licensees filed a claim with FINRA on behalf of us, the plaintiffs, under case number 15-02051. This case was presented in 2015. Since the initial hearing with the arbitrators was held in 2016, the hearing on the merits of the case before the Panel of Arbitrators was scheduled for the months of June or July 2017.

As the date of the hearing on the merits approached, in May 2017, Atty. Toskes that prior to the mediation hearing, a mediation process would be carried out in the offices of UBS attorneys in San Juan, Puerto Rico. We arrived at the mediation without having met with Mr. Toskes, Klayman or Carlo, at the offices of McConnel Valdés in San Juan, Puerto Rico. Only Mr. Toskes appeared at said mediation. There was no legal representation from Atty.'s office. Osvaldo Carlo during the aforementioned mediation.

Because in the mediation process, which we were informed was not mandatory, it was not possible to reach a reasonable transaction in consideration of the million-dollar loss we suffered, the final arbitration hearing was again scheduled for November 27, 2017. The June hearing was suspended to attend to the case first in mediation. The November 2017 hearing was suspended due to the passage of Hurricane Maria through Puerto Rico.

Because we had not heard from our attorneys after the hurricane, we contacted Mr. Toskes in October 2017, who informed us that the hearing in his fund had been suspended by FINRA. Given this statement, we asked for a meeting to see how the process could be expedited considering that we want to enter the arbitration hearing in the absence of a reasonable transaction offer considering our losses.

On December 21, 2017, we met with Mr. Klayman for the first time at his offices in the State of Florida. At said meeting, and after having discussed the case, we informed Atty. Klayman that given UBS's position of not compromising for a reasonable sum, it was our interest to continue with the case pending arbitration. At that time, Atty. Klayman told us that if we wanted to go to the hearing of the case, he couldn't be our lawyer. He told us that for the hearing of the case before the Panel of Arbitrators "If you want arbitration, I am not your doctor." Furthermore, Mr. Klayman told us that if we decided to go to arbitration with another lawyer, we would not have to pay anything to his law firm and that of Mr. Carlo.

At the recommendation of the Attorney, Klayman consulted another attorney after the December meeting, who told us that he could not look at our case, or even meet, until our current legal representation withdrew from the case. Thus, and considering that Mr. Klayman would not hear our case in arbitration, we asked that our file be delivered to us. The response from Klayman & Toskes was a letter dated January 25, 2018, a copy of which is attached, which, far from collecting what was discussed and reported by Atty. Klayman, it is an accommodating and

unethical way for lawyers to distort the facts, since it contradicts everything that Mr. Klayman had personally indicated to us in December 2017.

We present this complaint because we understand that the defendant lawyers failed in their ethical duty towards us, and also violated the Rules of the Supreme Court. The latter particularly when Atty. Toskes accompanied us to a mediation at the McConnel Valdés offices without any attorney from Atty. Osvaldo Carlos. Regarding ethical violations, we understand that the Law Office of Klayman & Toskes lied to us as they refused to enter a final arbitration hearing after UBS refused to settle the case for a reasonable sum. The contract between the parties provided for the attorneys to take the case to the arbitration hearing.

Finally, the Law Office of Klayman & Toskes has behaved unethically by requesting that we pay the case costs, as well as a $60,000 amount in attorney fees. Please refer to the attached letter dated January 25, 2017.

WHEREFORE we respectfully request this Honorable Commission to investigate the behavior of attorneys Lawrence Klayman, Steven Toskes and Osvaldo Carlo regarding the handling of our case and determine that they violated the applicable canons of ethics, as well as the provisions of the Supreme Court contained in its regulations and what was resolved in the case of In re: Wolper. In Ponce, Puerto Rico, today January 30, 2018.

109.    On March 1, 2018, Defendants sent a letter to FINRA together with a charging lien that stated: "Enclosed please find an Klayman & Toskes, P.A. and Carlo Law Office P.S.C.'s Notice of Charging Lien. This is being sent to FINRA for notification purposes only. Should you have any questions, please feel free to contact our office." In the lien signed by Toskes on behalf of Defendants asked: "The Law Firms of Klayman & Toskes, P.A. ("K&T") and Carlo Law Offices, C.S.P. ("Carlo Law Office"), hereby provide notice to Claimant, Salvador Jimenez ("Jimenez"), his attorney, Luis Miñana, and counsel for UBS Financial Services of Puerto Rico and UBS Financial Services, Inc., Bressler, Amery & Ross, that they hereby file their Notice of Charging Lien pursuant to the Fee Agreement entered into between Jimenez and the offices of K&T and Carlo Law Office on March 25, 2015."

110.    In response, the Jiménez hired Atty. César A. Hernández-Colón who wrote to the defendants a letter on March 21, 2018, stating that:

"My clients have provided me with the enclosed certification issued by the Clerk of the Puerto Rico Supreme Court, stating that the attorneys that were

handling FINRA Case N. 15-02051 on behalf of Dr. and Mrs. Jiménez, Steven Toskes and Lawrence Klayman, did not request *pro hac vice* admission to represent them in said FINRA case.  This would mean that both were engaged  in the unauthorized practice of law in Puerto Rico, and the  professional services contract is null and void and thus no fees may be collected for services rendered. *Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court*, 949 P.2d 1 (Cal. 1998). […] it is Dr. and Mrs. Jiménez's position that K&T is not entitled to any contingent fee.  Contrary to what K&T maintains in the January 25, 2018, the end of the attorney-client relationship was a decision made by K&T for reasons other than the telephone conversation between Mrs. Jiménez and Mr.  Klayman of January 23, 2018.  The contract, if it were valid, does not provide for the payment of fees if the attorneys withdraw from the case on their own volition."

111.    The Jiménez were obligated through bullying tactics to sign an agreement to pay the $14,394.20 costs at a point after settlement or award of their claim. After a week of hearings in 2019, the Claim hearings were continued but then they got adjourned because of the COVID epidemic. Their claim finally settled for close to four times what defendants allegedly had obtained as a settlement offer, due to the impossibility of finalizing the Claim hearings, on February, 2022.

112.    On Friday, July 28, 2023, Klayman started another bullying chain of emails claiming that defendants were owed $74,394.20 and that they had to wire such to their account stating:

> "We did a recent search of public records and we discovered that case no. 15-02015, which was *Salvador Jimenez, et al. v. UBS Financial* settled for $XXX,000. We are extremely disappointed as this settlement was not disclosed to us despite our charging lien. We are very, very upset about this. […]"

113.    Klayman harassed the Jimenez with another eight emails with menacing language to which Defendants then tried to hand their PR office director, Osvaldo Carlo-Linares a check for the agreed amount of costs of $14,394.20 in person which he rejected stating that Klayman had instructed that Defendants would sue the Jimenez for the whole amount of $74,394.20. As recently as , September 5th, 2024, the Jimenez have been threatened with suits and legal actions by Defendants as recently as September 5th, 2024.

114.    On August 11, 2023, after much intimidation and having Mr. Klayman threaten the Jimenez with lawsuits and "doom", the Jimenez delivered a letter with a check to the Klayman Toskes offices in San Juan at the American Airlines Building that was rejected at that office, stating that Mr. Klayman had instructed to not accept less than $74,000.

115.    The enterprise, as to Jimenez plaintiffs entailed communications through emails, postal service, telephone and cellular network of materially false statements to the Plaintiffs, a pattern of lies and deceit about their potential claims and never disclosing that neither Klayman nor Toskes had applied for *pro hac vice* admission and were therefore practicing the law illegally. This illegal practice of the law in Puerto Rico is the proximate cause of all Plaintiffs and those similarly-situated, their suffering ands damages and of the damages suffered by all victims living through the same set of circumstances as the Jimenez or the Plaintiffs and that compose a class too numerous to handle as individual cases by the Court.

116.    The enterprise used the ill-gotten proceeds to buy advertisement in the Puerto Rico Newspapers daily to further and benefit their enterprise and paid for airfare and hotel accommodations at different hotels in Puerto Rico like the Vanderbilt, conducted seminars to sign up more clients at different hotel venues in Puerto Rico like the Caribe Hilton and in Miami and Fort Lauderdale, Florida where they also conducted mediations thus affecting interstate commerce.

117.    This conduct seems to be one that poses a threat of being a continued criminal activity that inevitably will be repeated.

### (b)  The Castillo Plaintiffs

118.    The Castillo plaintiffs suffered through a very similar pattern of bullying by Defendants as the Jimenez.

119.    The Castillos signed a retainer with Klayman Toskes to take their Claim to FINRA versus UBS in 2015, and their Statement of Claim was filed in FINRA with number: 17-00010 dated December 19, 2016.

120.    Defendants K&T wrote a letter to Plaintiffs on February 1, 2019, in which summarized the case history of the appointed arbitration Panel. In said letter Defendants argued to the Plaintiffs that their case had a great number of problems, weaknesses and disadvantages. The Castillo's case according to the Defendants had no merits and therefore Defendants made it very clear that their preference was to mediate the case instead of going through the arbitration hearing. For example:

> "It is difficult to predict a specific result in your case. Based on her award history, we believe that Ms. Carney, the Chair of your panel, has a bias against investors in FINRA arbitration cases. This bias seems to exist in cases involving Puerto Rico investments, as evidenced by the fact that she awarded investors only 8% of the nearly $2.4 million that they requested from Popular Securities."[15]

121.    Defendants K&T celebrated a mediation without Plaintiffs' presence or even awareness and then they went to the Castillo to notify them that a mediation had been held and that the amount that Respondents were offering them to settle their claim was $25,000. Mrs. Castillo was upset by the mishandling of her case and the lack of consideration towards her and her husband. Mrs. Castillo notified K&T of her discomfort so Defendant staged a second mediation in which they could be present. Thus, Defendants invited The Castillos to Miami for mediation. Toskes used the NOP damages story on the Castillos once again subtracting the income in the accounts since inception, instead of when the breach of duty occurred an used the low damages NOP number to tell them that their case was extremely weak and threatening that they could

---

[15] Both parties in a FINRA arbitration get a roster of Arbitrators to rank, that includes the right to strike a limited number of them. Nevertheless, they did not strike Chair Carney as this opinion of her as an arbitrator clearly shows that they should have.

actually be ordered to pay for the broker dealer respondent's attorney's fees. This occurred under the auspices of Mr. Herschman and his mediation services.

122.    It is important to point out that the Castillos were suffering from their health, at this point, something defendants had been informed of, and were planning a trip for a long time as if it could be their last, again, something defendants were aware of.

123.    Once they arrived, to the mediation location, they noticed that there were no official arrangements made for them, instead the mediation was carried out in the lobby of the building, in front of the elevator traffic, without any kind of privacy or consideration for them, or their frailty nor where they informed that the defendants had not been admitted to practice law in PR in their claim. Mrs. Castillo was so affected by Defendants K&T's lack of respect that she cried in the middle of the mediation and in front of everyone who was present in that building, causing them extreme duress and indignity, and thwarting their right to make informed decisions upon their Claim and the mediation.

124.    Since the Castillos did not accept the offer that UBS made in the "supposed" mediation, Atty. Carlo summoned the Plaintiffs to a meeting in his office just two weeks before the arbitration hearing. When they arrived at the meeting, they realized that Atty Carlo was not there but instead, the person assisting them was Mr. Toskes and he notified them that if they did not agree with the $245,000 they had offered to settle their case, they needed to seek a second opinion and a new attorney. It was not until half an hour later that Mr. Carlo arrived and convinced them that it was a fair offer since their case was not worth more due to the dividends they had received throughout the investments and offered to discount the contingency fee. The discomfort of Plaintiffs was so that Ms. Castillo wrote an email to Mr. Carlo in which she let him know her feelings, stating:

> "Good morning Counsel: I inform you that it bothered me very much and that it
> seemed unethical to me that the previous time I was scheduled to meet with you at
> your office, indicating that it would be for you to review my case with me, at no
> time did you inform me that the meeting would be with Mr. Toskes and that he
> would be the one who would receive me and lead the meeting since you arrived
> half an hour after it started."

125. Defendant K&T notified FINRA of the settlement of the case even before the

Plaintiffs signed any agreement. Once again pressuring them into accepting the settlement.

126. Plaintiffs felt forced to enter into a settlement agreement because of their health

condition and extreme duress. Mrs. Castillo expressed her reaction toward the handling of the case

and the pressure that Mr. Klayman and Mr. Toskes applied on them regarding the settlement and

their case probabilities.

> Email from October 30, 2023:
> "Mr. Klayman
> Included find the settlement agreement we have been forced to accept because
> your firm refused to take our case to arbitration…"

127. Attorney's Fees were 27.96% for a total of $68,502 plus expenses that were never

invoiced to the Castillos nor justified. These in turn were charged without having a right to do so

as they were practicing the law illegally and as such were not creditors to such payment. The

moneys were received in their IOLTA account in New York, to the best of our knowledge as well

as to their accounts in Florida and K&T distributed them through wire transfers illegally, retaining

the expenses and legal fees that they were not entitled to withhold, much less distribute among

themselves in furtherance of their enterprise, causing the proximate cause of damages to the

Castillo plaintiffs and all those similarly situated.

128. This conduct, repeated with Plaintiffs and clearly there modus operandi, seems to

be one that poses a threat of being a continued criminal activity that inevitably will be repeated,

that interferes with interstate commerce and that together with the illegality of the defendants' enterprise were the proximate cause of Plaintiffs' damages and all similarly situated.

## VI.   LOSS CAUSATION

129.   As detailed herein, Defendants made false and materially misleading statements during the Class Period that induced Plaintiffs and all similarly situated to believe that their legal representatives were admitted and unbiased and capable of giving them the legal advice they needed and operated as a fraud or deceit on the Class. As further detailed herein, the settlement agreements and particularly the monetary considerations for Claimants to agree to dismiss their claims in FINRA were conducted through Defendants' prior false statements, material misrepresentations, and fraudulent conduct for which they received payment illegally.  As a direct result, Plaintiffs and the Class suffered economic losses, under law, and is conduct bound to be repeated.

## VII.   CLASS ACTION ALLEGATIONS

130.   Plaintiffs bring this Action as a class action under *Federal Rules of Civil Procedure 23(a) and 23(b)(3)* on behalf of all persons who, having suffered losses from owning PR Bonds and the Closed End Funds from UBS PR during the period from January 1, 2013 to December 31, 2015 (the "PR Bonds and CEFs Damages Period"); contracted with Defendants to have them represent them legally in their Claim from October 1st, 2013 to October 1st, 2023 (the "Class Period"). Excluded from the Class are UBS PR, Santander LLC, Popular Securities LLC, Oriental Financial Services LLC, the Individual Defendants, any entity in which a Defendant has, or had, a controlling interest, members of the Individual Defendants' families and the legal representatives, agents, affiliates, heirs and successors-in-interest or assigns of any such excluded party.

131.   <u>Commonality & Predominance</u>: There is a well-defined community of interest in the questions of law and fact involved in this Action.   The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members are:

(a)   whether Defendants' acts and omissions complained of herein violated the federal laws of mail and wire fraud and outright fraud on the Class;

(b)   whether documents, including, *inter alia*, the Company's press releases and marketing materials, and Defendants' other public statements made during the Class Period contained misstatements of material fact, or omitted to state material facts, necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(c)   whether the results for the settlement offers were artificially represented as adequate and whether the advice for its adequacy was fraught with conflict during the Class Period due to the false and materially misleading statements, including non-disclosures, and illegality of their legal representation complained of herein;

(d)   whether Defendants' acts and practices in connection with the marketing, advertising, and sale of their services violated the Puerto Rico law and Rules of the PR Supreme Court;

(e)   whether Defendants received legal fees that they were not entitled to because they were not admitted to practice law in Puerto Rico and elsewhere were they conducted the representations of the PR Bonds and PR CEFs claims;

(f)     whether the illegality of their legal representations was the proximate cause for the members of the Class' damages;

(g)     whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure of such damages;

(h)     whether the Puerto Rico Supreme Court was owed the $800 per attorney per case that they carried out related to claims for damages from the PR Bonds and PR CEF claims;

(i)     whether this conduct seems to be one that poses a threat of being a continued criminal activity that inevitably will be repeated

(j)     whether their conduct of withdrawing and receiving wire transfers and moneys in their IOLTA accounts together with their management of such a trust account was legal.

132.    Typicality: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class sustained damages because of Defendants' misconduct alleged herein.

133.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel with significant experience in class action litigation and litigation involving alleged violations of the federal laws listed herein.  Plaintiffs have no interests that are contrary to, or in conflict with, those of the Class that Plaintiffs seeks to represent in this Action.

134.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members of the Class is impracticable and damages suffered by individual Class members may be relatively small whereas the expense and burden of individual litigation make it virtually impossible for the members of the

Class to individually redress the wrongs done to them by Defendants.  There will be no difficulty in the management of this Action as a class action.

### VIII.  <u>EQUITABLE TOLLING</u>

135.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, by suppressing information, failing to disclose that Defendants were not admitted to practice law in PR and that their advice and settlement offers were artificially and misguided by their scheme and misrepresenting their ability to advice legally and unbiasedly, actively concealed from Plaintiffs and the Class associated with the damages from PR Bond and PR CEFs debacle.

136.    As a result of Defendants' actions, Plaintiffs and the Class were unaware, and could not have reasonably known or learned through reasonable diligence; (1) that Plaintiffs and the Class were exposed to bias and to the risks described above, and/or (2) that those illegalities and inappropriate compensation were the direct and proximate result of Defendants' acts and omissions.

137.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and state of the illegal advice they were providing.  The Defendants were under a duty to disclose the true conflicts of interest, illegality of their legal representation and inability to give unbiased advice because (1) this information was non-public and the Defendants had, and continue to have, exclusive control over it, and (2) Defendants knew that the information was not available to the Plaintiffs or the Class.

138.    Plaintiffs and the Class had no knowledge that Defendants were engaged in the wrongdoing described herein.  As a result of the fraudulent concealment by the Defendants, the Plaintiffs and the Class could not have discovered previously that Defendants were benefiting from

their illegal conduct and scheme to defraud the Class and to defraud the Puerto Rico Supreme Court by not paying the appropriate *pro hac vice* $800 fee. There is no way that Plaintiffs and the Class, who are unsophisticated, could have discovered the fraud prior to this date.

139.    Substantive law in the case at bar is Puerto Rico's Civil Code as to statute of limitations. At the time of the malfeasance, PR Civil Code provided a statute of limitations for causes of actions that do not have a statute of limitation as 15 years.

## IX.    AIDING AND ABETTING AND CONCERTED ACTION

140.    The allegations in paragraphs 1 to 138 are hereby re-alleged as if fully incorporated herein. In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.  The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their lust for personal gain and breaches of fiduciary duty, and to receive substantial compensation as a result of misleading the Class and Plaintiffs.

141.    The Individual Defendants accomplished their common enterprise or common course of conduct by purposefully or recklessly violating state and federal law, the federal and state fraud statutes laws, and abdicate their duties as directors.  Each Individual Defendant was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

142.    Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

143.    At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendant and were at all times acting within the course and scope of such agency.

## IX. CAUSES OF ACTION

### COUNT I

### Fraud

144.  The allegations in paragraphs 1 to 143 are re-alleged and incorporated herein.

145.  "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." *Microsoft Corp. v. Computer Warehouse*, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing *Wadsworth, Inc. v. Schwarz–Nin,* 951 F.Supp. 314, 323 (D.P.R.1996)).

146.  As alleged in paragraphs in this Complaint, Defendants deliberately and with intent to defraud misrepresented to their clients that they were giving them unbiased legal advice and that they were authorized to do so and that this advice was in Plaintiffs best interest without disclosing their enterprise to defraud them.

147.  Plaintiffs deliberately and with intent to defraud misrepresented that the engagement of the Mediator was a cost-saving measure when, in reality, Defendants authorized the arrangement in order to enrich themselves.

148.  Defendants made these deliberate, false, and intentionally fraudulent misrepresentations in or around April 2014 and continued to make these misrepresentations as recently as June 14, 2023. Beginning in or about September, 2013 and continuing up to and until the date of the return of the instant Complaint, in the District of Puerto Rico and elsewhere, the defendants, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to commit the following offense: devise and intend to devise a scheme and

artifice to defraud and willfully participated in, with knowledge of its fraudulent nature, for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice and attempting to do so knowingly deposited and caused to be deposited mail matter to be sent and delivered by a private and commercial interstate carrier, in violation of 18 U.S.C. § 1341.

149.  Defendants knew that the arrangement with the Respondent Broker Dealers and through the services of Mediators would cause the victims of the PR Broker Dealers to receive hundreds of thousands of dollars less than they would have probably obtained, all the time saving the $800 per attorney *Pro Hac Vice* Admission fee accruable to the Supreme Court of Puerto Rico.

150.  The PR Supreme Court has established that: "[i]n order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." *Microsoft Corp. v. Computer Warehouse*, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing *Wadsworth, Inc. v. Schwarz–Nin,* 951 F.Supp. 314, 323 (D.P.R.1996)). 216.

151.  As outlined in Paragraphs 82 to 129 of this Complaint, Defendants misrepresented the cases circumstances for each Claimant such as Plaintiffs of by expressing damages as a function of a Net out of Pocket instead of Capital Damages with the intention of fraudulently procuring an agreement or authority from the Claimants to benefit the Broker Dealers and themselves in a *Quid Pro Quo*, or in a manner that was advantageous to all of them.

152.  Plaintiffs and all similarly situated victims of the enterprise relied on those false representations about economic condition and the defendants' portrayal of damages and of their specific cases and claims to acquiesce to lower than normal valuations of their claims to accept

inadequate settlements and paid the legal fees charged without knowing that the Defendants were not entitled to such. Defendants suffered damages as a result of relying on legal advice that fraudulently undervalued the worth of their Claim to make them settle for less than they should have.

153.  These legal fee payments were fraudulently procured by Defendants. Plaintiffs are entitled to $24,000,000 in damages, $12,000,000 in actual damages and $12,000,000 in punitive damages plus legal interest stemming from Klayman and Toskes' fraudulent acts.

**WHEREFORE** Plaintiffs respectfully requests the Court find Defendants jointly and severally liable to it for civil fraud and enter judgment in its favor for $24,000,000, along with legal interest, attorneys' fees and costs.

## COUNT II
### Breach of Fiduciary Duty

154.  The allegations in paragraphs 1 to 153 are re-alleged and fully incorporated herein.

155.  "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *Bonner v. Triple-S Management, et al*, No. CV 19-1228 (BJM), 2021 WL 5989772, at *2 (D.P.R. Dec. 17, 2021), aff'd sub nom. *Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677 (1st Cir. 2023)

156.  It has been recognized, under Puerto Rico law, that directors and officers of a corporation have a fiduciary relationship with the corporation and with the company's stockholders. *Epstein v. F. & F. Mortgage Corp.*, 106 DPR 211 (1977).

157.  Art. 2.03 of the Puerto Rico General Corporation Act of 2009, 14 L.P.R.A. § 3523. States as follows:

The authority and the powers conferred upon every corporation organized under the laws of the Commonwealth of Puerto Rico or upon the officers or directors thereof, by law or in

the certificate of incorporation or instrument with equal force and validity, or in the corporate bylaws, **shall be enjoyed and must be exercised by the corporation or by the officers or directors, as the case may be, in benefit of the stockholders of the corporation and for the prudent conduct of its businesses and affairs, as well as for the furtherance of its objectives and purposes.**(Emphasis added).

166. Given the fact that they are "managers of other people's businesses," the aforementioned article imposes on officers and directors the obligation to exercise their powers with the best interests of the corporation as their guiding principle. *Rivera Sanfeliz v. Jta. Dir. FirstBank*, 193 D.P.R. 38, 52 (2015) (citing C.E. Díaz Olivo, *Corporaciones*, San Juan, Publicaciones Puertorriqueñas, 2005, p. 67).

167. The article establishes the three primary responsibilities that correspond to officers and directors of a corporation. These are: "(1) the obligation to act within the scope of their authority, (2) the duty of diligence, and (3) the duty of loyalty, which in turn "are specifically outlined in Articles 4.03, 4.04, and 4.05 of the law." Id. (citing Díaz Olivo, *op. cit.*, p. 67.)

168. Article 4.03 of the Corporations Act, 14 L.P.R.A. § 3563, establishes that "[t]he directors and officers shall be bound to dedicate to the affairs of the corporation and to the exercise of their duties the attention and care which in a similar position and under analogous circumstances a responsible and competent director or officer would execute in applying his/her business judgment in good faith…"

169. Article 4.04 of the Corporations Act, 14 L.P.R.A. § 3564, establishes that "[w]henever the directors, officers and majority stockholders have personal interests in matters affecting the corporation, they shall be subject to a duty of loyalty which bounds them to act fairly in relation to corporate issues." In this case, due to the nature of their legal representation, they owed the Plaintiffs and the Class members a duty of loyalty.

170. As alleged throughout this Complaint, Defendants breached their fiduciary duty with the Plaintiffs and Class Members when they engaged in a pattern of racketeering activity, as described above, targeting the plaintiffs and when they engaged in brazen self-dealing, as described above, for their and their close allies' benefit.

171. Plaintiffs are entitled to at least $10,000,000 in damages stemming from Defendants' breaches of fiduciary duty.

**WHEREFORE** Plaintiffs respectfully requests the Court find Defendants liable to them for their constant and brazen breaches of fiduciary duty and enter judgment in Plaintiffs' favor for $10,000,000 along with attorneys' fees and costs.

<u>**COUNT III**</u>

<u>**Damages under Puerto Rico's General Tort Statute**</u>

172. The allegations in paragraphs 1 to 171 are re-alleged and fully incorporated herein.

173. Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

174. "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing *Ortiz v. Levitt & Sons of P.R., Inc.,* 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

175. "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Martinez-Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021.

176.  "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." *Vazquez-Filippetti*, 504 F.3d at 49.

177.  "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." *Ayala v. Kia Motor Corp.* (D.P.R. Sept. 30, 2022); citing *Malave-Felix*, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); *see Rivera-Santiago v. United States*, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person."). As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

178.  Accordingly, these defendants are jointly and severally liable to Plaintiffs for the damages they caused. This conduct seems to be one that poses a threat of being a continued criminal activity that inevitably will be repeated.

179.  Plaintiffs are entitled to $1,000,000 in damages stemming from the defendants' tortious acts.

**WHEREFORE** Plaintiffs respectfully request the Court find Defendants jointly and severally liable to them for their tortious conduct and enter judgment in their favor for $1,000,000 along with attorneys' fees and costs.

## COUNT IV
## Damages under Puerto Rico's General Tort Statute

180.  The allegations in paragraphs 1 to 179 are re-alleged and fully incorporated herein.

181.  Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

182.  "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing *Ortiz v. Levitt & Sons of P.R., Inc.,* 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

183.  "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Martinez-Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

184.  "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." *Vazquez-Filippetti*, 504 F.3d at 49.

185.  "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." *Ayala v. Kia Motor Corp*. (D.P.R. Sept. 30, 2022); citing *Malave-Felix*, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); *see Rivera-Santiago v. United States*, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

186.  Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

187.  "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing *Ortiz v. Levitt & Sons of P.R., Inc.,* 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

188.  "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Martinez-Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022). 261. "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." *Vazquez-Filippetti*, 504 F.3d at 49.

189.  "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." *Ayala v. Kia Motor Corp*. (D.P.R. Sept. 30, 2022); citing *Malave-Felix*, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); *see Rivera-Santiago v. United States*, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

190. Defendants owed Plaintiffs a duty to conduct themselves as reasonably prudent persons and/or corporate entities. As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

191. Accordingly, these defendants are jointly and severally liable to Plaintiff for the damages they caused.

192. Defendants owed the Plaintiffs a duty to conduct themselves as reasonably prudent persons and/or corporate entities. As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

193. Accordingly, these defendants are jointly and severally liable to Plaintiff for the damages they caused. This conduct seems to be one that poses a threat of being a continued criminal activity that inevitably will be repeated.

194. Plaintiffs are entitled to $25,000,000 in damages stemming from their tortious acts.

**WHEREFORE** Plaintiffs respectfully request the Court find Defendants severally liable to them for their tortious conduct and enter judgment in their favor for $25,000,000 along with attorneys' fees and costs.

## COUNT V
## Unjust Enrichment

195. The allegations in paragraphs 1 to 194 are realleged and fully incorporated herein.

196. "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in *Ortiz-Andújar v. Commonwealth of Puerto Rico*, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." *Gov't of Puerto Rico v. Carpenter Co*., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

197.  The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." *Id* at 466; citing *Ortiz-Andújar*, *supra*.  Article 1520 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10788, establishes that "whomever, without just cause, has made a payment for which there was not a legal duty or reason, has the right to ask for its restitution from whom received it. Article 1522 grants legal interest upon those amounts unduly paid If the one/s receiving the payments knew that they were not entitled to the payments.

198.  "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" *Rivera v. Marriott Int'l, Inc.,* 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing *Montalvo v. LT's Benjamin Records, Inc.,* 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing *Hatton v. Municipality of Ponce*, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

199.  During the time period relevant to this action, the defendants received in their bank accounts through wire transfers or through checks via US postal Service hundreds of thousands, if not millions, of dollars from the Broker Dealers.

200.  The sums paid to these defendants included monies to which they were not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above.

201. Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendants as a result of their racketeering activity, fraud, and/or tortious conduct, as detailed above.

202. The circumstances render Defendants' retention of those benefits inequitable unless they pay Plaintiffs the value of the benefit. There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

203. Plaintiffs are entitled to a sum to be determined later but reasonably estimated to be at least $36,000,000 in damages stemming from Defendants' unjust enrichment.

204. "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in *Ortiz-Andújar v. Commonwealth of Puerto Rico*, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." *Gov't of Puerto Rico v. Carpenter Co*., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

205. The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing *Ortiz-Andújar*, *supra*. "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" *Rivera v. Marriott Int'l, Inc*., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing *Montalvo v. LT's Benjamin Records, Inc*., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing *Hatton v. Municipality of Ponce*, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

206. The sums paid to these defendants included monies to which they were not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above. Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendants as a result of their racketeering activity, fraud, and/or tortious conduct,

as detailed above. The circumstances render Defendants' retention of those benefits inequitable unless they pay Plaintiffs the value of the benefit. There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

207. Plaintiffs are entitled to $36,000,000 in damages stemming from Defendants' unjust enrichment.

**WHEREFORE** Plaintiffs respectfully request the Court find Defendants jointly and severally liable to them for unjust enrichment and enter judgment in their favor for $36,000,000 along with legal interest, attorneys' fees and costs.

**COUNT VII**
**Breach of Implied Duty to Act in Good Faith**
**(Against All Defendants)**

208. Plaintiffs incorporate by reference and restate each and every allegation set forth from 1 to 207 above as if fully set forth herein.

209. *Article 1258 of the Civil Code* provides that contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law. The Supreme Court of the Commonwealth of Puerto Rico has stated and reiterated that any contract and agreement must have as its foundation principles of good faith and fair dealing in the trade. Requiring good faith in the conduct and actions of all parties is a governing principle in all legal activity and consists in acting in a loyal, honest and fair manner. It assumes faithful compliance with the representations and agreements reached and that a party will not defraud or abuse the trust given by the other. Good faith is a source of duties and conduct that can be demanded in each case in accordance to the nature of the legal relationship and the purpose or objective pursued by the parties through it.

210.  The actions and conduct of the Defendants throughout the Class Period clearly and expressly demonstrate a lack and complete absence of any basic good faith principles or compliance with fair dealing standards in fulfilling their contractual obligations to Plaintiff and the Class.  To the contrary, the conduct, actions and dealings of Defendants clearly show complete and absolute bad faith and disregard, not only of the applicable laws and regulations, but of basic principles of fair and honest dealings. This conduct in bad faith has caused damages to Plaintiffs. Total damage incurred are at least in the tens of millions of dollars, and likely substantially higher. Defendants are jointly and severally liable for all damages, losses and injuries caused thereby.

211. Defendants acted in bad faith in making materially false and fraudulent misrepresentations in connection with the sale of the Funds to Plaintiffs.

212.  As a direct result of Defendants' actions, Plaintiffs have suffered irreparable harm, and have, and will continue to suffer monetary damages in an undetermined amount to be in excess of ten million dollars ($10,000,000).

213.  The facts set forth in this Complaint constitute violations to Federal as well as Commonwealth of Puerto Rico statutes. The claims arising from said violations arise from the same nucleus of operative facts. Supplemental jurisdiction to adjudicate all claims under Commonwealth law is appropriate under *28 USC § 1367*. Defendants are liable jointly and severally to Plaintiffs for said violations.

214.  The Defendants are jointly and severally liable to Plaintiffs for all sums requested in this Complaint, as well as for all prejudgment and post judgment interest, cost and attorneys' fees as prescribed by Commonwealth law.

## X.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray that the Court award the following:

A.      An award of damages, including compensatory and punitive damages to Plaintiffs as a result of Defendants' wrongdoing;

B.      Rescission of all the monies paid by Plaintiffs to Defendants;

C.      Statutory and common law interest thereon;

D.      Plaintiffs' attorneys fees and costs;

E.      Damages for the moneys owed in *pro hac vice* admission fees to the Puerto Rico Supreme Court;

F.      Enter Order certifying this case as a class action under Rule 23;

G.      Such other relief as the Court may deem just and proper to remedy the alleged wrongs committed by the Defendants.

## XI.      <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury. DATED:  September 16, 2024

RESPECTFULLY SUBMITTED

*/S/Luis E. Miñana/* USDC-PR 225608
RUA 16,297
122 Domenech Ave.
Altos Baldrich
San Juan, PR 00918
787-758-1999 Cel. 787-402-2226
minanalaw@yahoo.com
securitiesatty.com

*/S/Héctor Eduardo Pedrosa-Luna/* USDC-PR 223202
P.O. Box 9023963
San Juan, PR 00902-3963
787-920-7983 Fax  787-764-7511
hectorpedrosa@gmail.com

*/S/ Jennie Espada Ocasio/* USDC 225003 RUA 16340
PO Box 13811.
San Juan, PR 00908
Tel. (787) 758-1999/787-633-7199
espada.esquire@gmail.com

**ESPADA, MIÑANA & PEDROSA LAW OFFICES, PSC**

*Counsel for Plaintiffs*